2

1                          JOHN GUNSALUS                    45

2        Q.    Okay.  Can you get any closer in time to that

3   without speculating?

4        A.    It would be safe to say between one and three

5   minutes.

6        Q.    The 50 to 70 people that you testified about

7   who were there who were kind of loud, had that noise

8   completely abated by the time you approached

9   Mario Franco?

10       A.    Yes, sir, for the most part, yes, sir.

11       Q.    Did they run, did they walk, did they do

12  something else, the 50 to 70 people to leave the scene?

13       A.    A lot of people ran.  A lot of people walked.

14  A lot of people drove off in the vehicles, and once the

15  vehicles left, a lot of the loud music left with them.

16       Q.    So in the one to three minutes, had the noise

17  level diminished completely?

18       A.    Not completely, but very drastically.

19       Q.    It was still kind of noisy?

20                    MS. GARVEY:   Objection.

21       A.    Not where you couldn't hear us giving verbal

22  commands.

23  BY MR. LICHTMACHER:

24       Q.    How far away were you from Mario Franco when

25  you allege you gave the verbal commands?

```
1                        JOHN GUNSALUS            46
2        A.    I would say approximately 15 to 20 feet.
3   There were still some people there.
4        Q.    And there was still some noise there?
5        A.    Yes, sir.
6        Q.    And he was facing the car?
7        A.    Yes, sir.
8        Q.    "Franco immediately spun around to face this
9   officer where he did grab this officer by my upper
10  uniform sleeves.  Franco stated, 'Let go of me.  What
11  you doing?  Let go of me.  I'm telling you to let go of
12  me.'"
13              You have that as a quote in your document.
14  Does that mean it's exactly what he said or close to
15  exactly what he said?
16       A.    It's close to what he exactly said.
17       Q.    When is the first time you wrote that down?
18       A.    When I proceeded to do this report.
19       Q.    How long was that after the incident on the
20  street with Mr. Franco?
21       A.    I honestly could not tell you.
22       Q.    Was it days, hours?
23       A.    No, sir.  It was that morning.  It was
24  shortly after this.
25       Q.    Do you remember what your tour of duty was
```

```
 1                        JOHN GUNSALUS              114

 2        A.    No, he did not.

 3        Q.    What did you do when he did not follow your

 4   command?

 5        A.    I approached Mario from his right side and

 6   placed my hand on his back and he had a loose T-shirt

 7   and I ordered him to put his hands behind his back.

 8        Q.    Did you tell him he was under arrest at that

 9   point?

10        A.    Yes.

11        Q.    After you grabbed him by the back of his

12   shirt and told him he was under arrest and asked him to

13   put his hands behind his back, what did he do?

14        A.    He immediately spun around on myself and

15   tried to get away from me and we both grabbed each other

16   by the shirt sleeves -- upper shirt sleeves by the

17   biceps area.

18        Q.    Explain to me how he was trying to get away

19   from you.

20        A.    He was trying to back peddle and trying to

21   pull away from me.

22        Q.    Correct me if I'm wrong, but I believe you

23   testified that after you grabbed him by the back of his

24   shirt, that he spun around?

25        A.    Correct.
```

1                         JOHN GUNSALUS                    118

2        A.     It's small.  It's probably six inches.  About

3   that big (indicating).

4        Q.     Did you ever use your baton that night?

5        A.     No, I did not.

6        Q.     Can you explain how Mario Franco ended up

7   from the driver's side area of the vehicle to the back

8   of the vehicle?

9        A.     Mario was aggressively pushing me and we

10  ended up going backwards out of the roadway to the rear

11  portion of the Cadillac due to Mario's aggressive

12  actions.

13       Q.     What did you do in response to his actions?

14       A.     At that point in time, after giving several

15  verbal commands to stop resisting and put his hands

16  behind his back, as well as Officer Kelly giving him

17  verbal commands and trying to break his grasp, at that

18  point in time I delivered one closed-fist strike to the

19  left side of his face.

20       Q.     Prior to striking him on the left side of his

21  face, was he still resisting?

22                    MR. LICHTMACHER:  Object to the

23                form, Ms. Garvey.

24                    MS. GARVEY:  I'll rephrase it.

25                    MR. LICHTMACHER:  It's been asked,

```
1                        JOHN GUNSALUS           119
2                    so you know what the answer is going to
3                    be.
4                        MS. GARVEY:  I don't think I asked
5                    him anything about actively resisting.
6                        MR. LICHTMACHER:  You just
7                    suggested what was going on.
8  BY MS. GARVEY:
9      Q.    Prior to striking him in the left side of his
10 head, how would you characterize how he was resisting?
11     A.    He did not comply with this officer's
12 commands to put his hands behind his back and instead he
13 decided that he would first attempt to flee; and then
14 secondly, he decided to become the aggressor and
15 physically challenge the officer instead of complying
16 with myself and Shawn Kelly's verbal commands to put his
17 hands behind his back and stop resisting.
18     Q.    After you struck Mario Franco in the left
19 side of his face, what happened?
20     A.    Mario lost his balance and went to the
21 ground.
22     Q.    I believe you also indicated that there was
23 another strike to Mario Franco; is that correct?
24     A.    Yes.
25     Q.    How did that occur?
```

```
1                    JOHN GUNSALUS              120

2      A.    As he went down, I went down with him and I

3  struck him in the midsection of his stomach area.

4      Q.    Was that an intentional strike?

5      A.    It was unintentional, but I made contact, so

6  I included it as a strike to his midsection.

7      Q.    When you say it was unintentional, what do

8  you mean by that?

9      A.    I was trying to catch myself as well.

10     Q.    When Mario Franco fell to the ground after

11 you first struck him, what position did he land in?

12     A.    He was on his back.

13     Q.    Did you feel the need to get him in a

14 different position?

15     A.    Yes.

16     Q.    Why?

17     A.    Because he was unable to be handcuffed

18 because he was laying on his back.  He has to have his

19 hands behind his back in order to be handcuffed.

20     Q.    What position did you intend to put him into?

21     A.    Prone position with his chest and stomach

22 down against the pavement.

23     Q.    Did Officer Kelly assist you with that?

24     A.    Yes.  He began to.

25     Q.    He began to?
```

```
1                          JOHN GUNSALUS                    75

2   person," it says, "person type" "AR," and I see

3   Mario Franco's name, the race is black; is that correct?

4        A.     Correct.

5        Q.     Ethnicity "N"; is that "Negro"?

6        A.     No, non-Hispanic.

7        Q.     Thank you.  Sex is "male."  Date of birth we

8   have.  We have his age, height, weight.  How did you get

9   his weight or did you generate what his weight was?

10       A.     I honestly don't know.

11       Q.     Then you have an address 506 West Seneca, is

12  that his home address at that time?

13       A.     That must have been an address that he gave

14  at that time.

15       Q.     And then his Social Security number.

16              Underneath that, it says, "Refused orders to

17  disperse/resisted arrest."  Did you type that in or is

18  that part of the form?

19       A.     I typed that in.

20       Q.     Did he obstruct government administration

21  that evening?

22       A.     He could have somewhat.  I just didn't put

23  the charge.

24       Q.     That was your choice, correct?

25       A.     Yes.
```

1                          JOHN GUNSALUS                     76

2        Q.    Moving down, it says "case status, closed."

3   What does that mean?

4        A.    It's closed due to arrest.

5              If you have a burglary and you don't know who

6   the suspect is or you're waiting for fingerprints, it

7   would be an open case.

8        Q.    "Lab submission request," right-hand corner

9   "N."  Is that "not applicable" or something else?

10       A.    "No."

11       Q.    That's convenient.

12             Next page.  These three charges, who chose

13  these three charges?

14       A.    I did.

15       Q.    Disorderly conduct, correct?

16       A.    Correct.

17       Q.    Harassment in the second, and that's a

18  violation, harassment; is that correct?

19       A.    Correct.

20       Q.    And "resisting arrest" is a misdemeanor,

21  correct?

22       A.    Correct.

23       Q.    And that comes with a potential one-year

24  sentence in prison, correct?

25       A.    Correct.

```
1                           JOHN GUNSALUS              25

2     are violations.  I realize they're considered petty

3     offenses, but just to be comprehensive, I'll say

4     "crimes."

5                     MS. GARVEY:  Sure.

6     BY MR. LICHTMACHER:

7          Q.    So now, do you know if any other officers

8     reported the alleged crimes to the DA of Mario Franco

9     the night of July 5th, 2016, or the morning -- 2014?

10         A.    Are you talking about other reports regarding

11    Mario?

12         Q.    Yes.

13         A.    Shawn Kelly might have done a report.  It's

14    called a 19.  It's a supplemental report.  I'm sure he

15    did one.

16         Q.    Do you know if Shawn Kelly testified at the

17    criminal trial of Mario Franco?

18         A.    Yes, he did.

19         Q.    Did you come together with him to testify at

20    that trial?

21         A.    Do you mean -- can you rephrase that, please?

22         Q.    Did you guys travel together to testify at

23    the criminal trial of Mario Franco?

24         A.    No, sir.

25         Q.    Did you meet with the DA before you testified
```

```
1                         JOHN GUNSALUS              24

2    reviewed paperwork that you generated?

3         A.    No.

4         Q.    Did you consult with him -- withdrawn.

5               You generated paperwork regarding the arrest

6    of Mario Franco, correct?

7         A.    Correct.

8         Q.    You also testified in his criminal trial,

9    correct?

10        A.    Correct.

11        Q.    Are you aware of the result of that criminal

12   trial?

13        A.    Yes, sir.

14        Q.    What is the result?

15        A.    He was found innocent.

16        Q.    Were you the person who signed off --

17   withdrawn.  You generated paperwork and forwarded it to

18   the DA in that case?

19        A.    Yes, sir.

20        Q.    And you consulted with the DA in that case?

21        A.    Yes, sir.

22        Q.    Is it fair to say you reported the alleged

23   crimes to the DA in that case?

24        A.    Yes.

25        Q.    I'm using the term "crimes" even though some
```

1                          JOHN GUNSALUS                25

2      are violations.  I realize they're considered petty

3      offenses, but just to be comprehensive, I'll say

4      "crimes."

5                     MS. GARVEY:  Sure.

6      BY MR. LICHTMACHER:

7           Q.   So now, do you know if any other officers

8      reported the alleged crimes to the DA of Mario Franco

9      the night of July 5th, 2016, or the morning -- 2014?

10          A.   Are you talking about other reports regarding

11     Mario?

12          Q.   Yes.

13          A.   Shawn Kelly might have done a report.  It's

14     called a 19.  It's a supplemental report.  I'm sure he

15     did one.

16          Q.   Do you know if Shawn Kelly testified at the

17     criminal trial of Mario Franco?

18          A.   Yes, he did.

19          Q.   Did you come together with him to testify at

20     that trial?

21          A.   Do you mean -- can you rephrase that, please?

22          Q.   Did you guys travel together to testify at

23     the criminal trial of Mario Franco?

24          A.   No, sir.

25          Q.   Did you meet with the DA before you testified

```
 1                      JOHN GUNSALUS              26
 2   at Mario Franco's trial?
 3       A.    Yes, sir.
 4       Q.    Who was there with you?
 5       A.    It was Jarrett Woodfork.
 6       Q.    Who is that?
 7       A.    He is from the District Attorney's Office.
 8   He was the prosecuting attorney.
 9       Q.    Was Officer Kelly with you when you spoke to
10   Mr. Woodfork?
11       A.    Yes.
12       Q.    So he was in the room with you when you spoke
13   with him?
14       A.    I believe so, yes.
15       Q.    The three of you spoke at the same time about
16   the trial that was coming up?
17       A.    Yes.
18       Q.    You had an idea what he was going to say; is
19   that fair to say?
20       A.    That's fair.
21       Q.    And he had an idea what you were going to
22   say?
23       A.    Yes.
24       Q.    And the DA was okay with the three of you
25   being in a room together?  He didn't say we can't do
```