**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**MARIO FRANCO,**

                                        **Plaintiff,**

        **v.**                                                          **5:16-CV-634**
                                                                        **(FJS/TWD)**
**POLICE OFFICER JOHN GUNSALUS and**
**POLICE OFFICER SHAWN KELLEY,**

                                        **Defendants.**
_____

**APPEARANCES**                              **OF COUNSEL**

**THE LAW OFFICE OF FRED**                   **FRED B. LICHTMACHER, ESQ.**
**LICHTMACHER, P.C.**
116 West 23rd Street
Suite 500
New York, New York 10011
Attorneys for Plaintiff

**BERGSTEIN & ULLRICH, ESQ.**                **STEPHEN BERGSTEIN, ESQ.**
5 Paradies Lane
New Paltz, New York 12561
Attorneys for Plaintiff

**HANCOCK ESTABROOK LLP**                    **JOHN G. POWERS, ESQ.**
1800 AXA Tower I                             **MARY L. D'AGOSTINO, ESQ.**
100 Madison Street
Syracuse, New York 13202
Attorneys for Defendants

**OFFICE OF THE CORPORATION**                **TODD M. LONG, ESQ.**
**COUNSEL – CITY OF SYRACUSE**               **DANIELLE B. PIRES, ESQ.**
233 East Washington Street
Room 300
Syracuse, New York 13202
Attorneys for Defendants

**SCULLIN, Senior Judge**

## MEMORANDUM-DECISION AND ORDER

## I. INTRODUCTION AND BACKGROUND

Plaintiff commenced this action in June 2016 alleging claims against the City of Syracuse and Defendants John Gunsalus and Shawn Kelley (hereinafter collectively referred to as Defendants) alleging that they violated his constitutional rights by using excessive force, failing to intervene, falsely arresting him, and maliciously prosecuting him, among other things. *See* Dkt. No. 1, Compl., at ¶¶ 24-72.  The allegations arose out of an incident in July 2014, when Defendants arrested Plaintiff while he was outside of a party on Victoria Place, near the Syracuse University campus.  *See id.* at ¶¶ 10-23.  Plaintiff's failure to intervene claim against Defendant Kelly and his false arrest, excessive force, and malicious prosecution claims against both Defendants survived Defendants' motion for summary judgment.  *See* Dkt. No. 87.

During the trial, Plaintiff presented evidence from seven witnesses and introduced nine exhibits, and Defendants presented evidence from eight witnesses and introduced more than thirty exhibits.  The jury returned a verdict on the sixth day of trial, July 20, 2021, finding Defendant Gunsalus liable for false arrest, use of excessive force, and malicious prosecution. *See* Dkt. No. 172 at 1-2.  The jury also found Defendant Kelley liable for false arrest but did not find him liable for failure to intervene or malicious prosecution.  *See id.* at 2.  In response to various special interrogatories, the jury found that Defendants did not prove, by a preponderance of the evidence, that (1) Plaintiff ignored verbal commands from Defendant Gunsalus to leave the roadway on Victoria Place; (2) Defendant Gunsalus was identifiable as a police officer when he approached Plaintiff; (3) Defendant Gunsalus had a justifiable belief that Plaintiff had observed lights on the police vehicle or heard the instructions via the intercom to

disperse; (4) Plaintiff exerted some pressure on Defendant Gunsalus – either pushing or pulling – by placing his hands on Defendant Gunsalus's uniform sleeves or upper arms; and (5) Defendant Gunsalus struck Plaintiff only once in the head and once in the body.  *See* Dkt. No. 173 at 1-2.  On the issue of damages, the jury awarded Plaintiff $5,000 in compensatory damages as a result of Defendant Gunsalus's actions and $1.00 in nominal damages as a result of Defendant Kelley's actions.  *See* Dkt. No. 172 at 3-4.

On August 17, 2021, Plaintiff filed the pending motion for a new trial on punitive damages pursuant to Rule 59(a)(1) of the Federal Rules of Civil Procedure.  *See* Dkt. No. 187. If the Court grants that motion, Plaintiff further asks, pursuant to Rule 37, that the Court permit him to introduce evidence at the new trial that Defendant Gunsalus placed a hard object against Plaintiff's throat shortly before subjecting him to the use of excessive force.  *See id.*

Less than a week later, on August 23, 2021, Defendants filed the pending motion for judgment as a matter of law ("JMOL") pursuant to Rule 50(b) or, in the alternative, for a new trial pursuant to Rule 59.  *See* Dkt. No. 192.  Defendants additionally requested the Court's ruling on the affirmative defense of qualified immunity.  *See* Dkt. No. 194, Def's Memorandum in Support of JMOL, at 6.

## II. DISCUSSION

### A.  Defendants' motion for judgment as a matter of law

"'To warrant post-verdict judgment as a matter of law, the movant must show that the evidence, when viewed most favorably to the non-movant, was insufficient to permit a reasonable juror to have found in the non-movant's favor.'"  *Moore v. Keller*, No. 5:16-CV-1230, 2021 U.S. Dist. LEXIS 168700, *4 (N.D.N.Y. Sept. 7, 2021) (Hurd, J.) (quoting *Conte v.*

*Emmons*, 895 F.3d 168, 171 (2d Cir. 2018)).  "This is a 'particularly heavy burden where, as here, the jury has deliberated in the case and actually returned its verdict in favor of the non-movant.'"  *Carroll v. Cnty. of Monroe*, 712 F.3d 649, 651 (2d Cir. 2013) (quoting *Cash v. Cnty. of Erie*, 654 F.3d 324, 333 (2d Cir. 2011) (internal quotation marks omitted)).  "Therefore, [the court] may set aside a verdict 'only if there exists such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture, or the evidence in favor of the movant is so overwhelming that reasonable and fair minded persons could not arrive at a verdict against it.'"  *Id.* (quoting [*Cash*, 654 F.3d at 333] (internal quotation marks omitted)).

Defendants claim that they are entitled to JMOL both based on the facts and evidence established at trial and on the issue of qualified immunity, an affirmative defense they had previously raised and on which the Court reserved judgment.  "'Qualified immunity shields federal and state officials from money damages unless a plaintiff pleads facts showing (1) that the official violated a statutory or constitutional right, and (2) that the right was "clearly established" at the time of the challenged conduct.'"  *Ricciuti v. Gyzenis*, 834 F.3d 162, 167 (2d Cir. 2016) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 735, 131 S. Ct. 2074, 179 L. Ed. 2d 1149 (2011) (citation omitted)) (other citation omitted).  Even if the right was clearly established, a defendant is entitled to qualified immunity if "'it was objectively reasonable for the [official] to believe the conduct at issue was lawful.'"  *Rodriquez v. McKoy*, No. 9:15-CV-0610 (MAD/TWD), 2021 U.S. Dist. LEXIS 195917, *30 (N.D.N.Y. Oct. 12, 2021) (D'Agostino, J.) (quoting *Phillips v. Wright*, 553 Fed. Appx. 16, 17 (2d Cir. 2014)) (other citation omitted).

### 1.   Whether Defendants are entitled to JMOL or qualified immunity on Plaintiff's false arrest claim

"Under New York law, an action for false arrest requires that the plaintiff show that '(1) the defendant intended to confine him, (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement and (4) the confinement was not otherwise privileged.'" *Ackerson v. City of White Plains*, 702 F.3d 15, 19 (2d Cir. 2012) (quoting *Broughton v. State of New York*, 37 N.Y.2d 451, 456, 335 N.E.2d 310, 373 N.Y.S.2d 87 (1975)). "Probable cause 'is a complete defense to an action for false arrest' brought under New York law or § 1983." *Id.* (quoting *Weyant*, 101 F.3d at 852 (internal quotation marks and citation omitted)); *see Hulett v. City of Syracuse*, 253 F. Supp. 3d 462, 494 (N.D.N.Y. 2017) (Hurd, J.). "'Put another way, an arresting officer will find protection under the defense of qualified immunity unless "no reasonably competent officer" could have concluded, based on the facts known at the time of the arrest, that probable cause existed.'" *Moore*, 2021 U.S. Dist. LEXIS 168700, *13-*14 (quoting *Figueroa v. Mazza*, 825 F.3d 89, 100 (2d Cir. 2016)). Notably, whether the defendant had probable cause is "'viewed from the standpoint of an objectively reasonable police officer.'" *Benn v. Kissane*, 510 F. App'x 34, 37 (2d Cir. 2013) (summary order) (quoting *Ornelas*, 517 U.S. at 696) (other citation omitted).

Plaintiff claims that he was falsely arrested for violating the following four sections of New York's Penal Law: disorderly conduct with respect to both obstructing traffic and refusing to comply with a lawful order; harassment in the second degree; and resisting arrest. Under New York law, "[a] person is guilty of disorderly conduct when, with intent to cause public inconvenience, annoyance or alarm, or recklessly creating a risk thereof . . . [h]e obstructs vehicular or pedestrian traffic; or . . . [h]e congregates with other persons in a public place and refuses to comply with a lawful order of the police to disperse. . . ." N.Y. Penal L. § 240.20(5)-

(6).  Furthermore, "[a] person is guilty of resisting arrest when he intentionally prevents or attempts to prevent a police officer . . . from effecting an authorized arrest on himself or another person."  N.Y. Penal L. § 205.30.  Finally, "[a] person is guilty of harassment in the second degree when, with intent to harass, annoy or alarm another person . . . [h]e or she strikes, shoves, kicks or otherwise subjects such other person to physical contact, or attempts or threatens to do the same[.]"  N.Y. Penal L. § 240.26(1).

With respect to Plaintiff's false arrest claim, the Court instructed the jury on these sections of the Penal Law and charged the jury with the following: "If you find that the Defendant you are considering had reasonable cause to arrest Plaintiff for Disorderly Conduct or Harassment in the Second Degree, then you must find that the arrest was lawful, regardless of whether Plaintiff was convicted of the crimes for which he was arrested."  *See* Dkt. No. 168 at 13.  Furthermore, with respect to resisting arrest, the Court instructed the jury as follows:

> [I]t is not unlawful to resist an unauthorized arrest.  Therefore, if you find that the Defendant you are considering did not have reasonable cause to arrest Plaintiff for Disorderly Conduct or Harassment in the Second Degree, then you must also find that that Defendant did not have reasonable cause to arrest Plaintiff for Resisting Arrest.

*Id.*

The Court also explained to the jury that "[r]easonable cause means that Defendants had information at the time they arrested Plaintiff that would cause a reasonable officer, under the same facts and circumstances as Defendants, to believe that Plaintiff committed or was about to commit a crime."  *Id.* at 11.  Thus, in finding Defendants liable for falsely arresting Plaintiff, the jury must have concluded that Defendants did not have reasonable cause to arrest Plaintiff for disorderly conduct or harassment in the second degree.  *See* Dkt. No. 172 at 1-2.  In requesting JMOL, Defendants argue that the jury was unreasonable in coming to this conclusion.

Nonetheless, when looking at the evidence in the light most favorable to Plaintiff, the Court finds that the jury reasonably came to this conclusion.

Plaintiff testified that he recalled that he arrived on Victoria Place and the party appeared to be over, so he parked his car and walked down the street to meet with some friends. *See* Dkt. No. 179, Pl's Trial Testimony, at 6-7.  Plaintiff further testified that he was talking with his friends, leaning inside of their car, which was parked legally, right up against the curb when a police officer, later identified as Defendant Gunsalus, grabbed him from behind.  *See id.* at 7-9.  Plaintiff stated that he did not hear anything that any police officers said when he was speaking with his friends, and he had not interacted with the police until Defendant Gunsalus grabbed him.  *See id.* at 8-9.  After being grabbed and "turned around," Plaintiff testified that Defendant Gunsalus pushed him against the car and pressed an object against his neck to choke him.  *See id.* at 9.  Plaintiff explained that, at no time had he been given any instructions from the police, and the only thing Defendant Gunsalus said to him before grabbing him was, "are you hard of hearing, mother f***er?"  *See id.*  At that point, Plaintiff described that Defendant Gunsalus swung his left hand to punch him in the face, he went to the ground, and Defendant Gunsalus continued to punch him while on the ground.  *See id.* at 10.  Plaintiff testified that he felt multiple punches on his right side, and he was "probably jerking" as a "reaction" to being punched, but he was not trying to run away, never tried to run away, and did not grab Defendant Gunsalus.  *See id.* at 12.

Elijah Johnson, one of Plaintiff's friends who testified at trial, explained that the police had arrived and broken up the party; however, he did not personally hear the police say anything or order people to disperse.  *See* Dkt. No. 181, Elijah Johnson's Trial Testimony, at 4-5, 15.  Elijah Johnson also testified that, after Plaintiff approached his car, Defendant Gunsalus

came up to Plaintiff and asked him if he listened and "[g]rabbed him and punched him." *See id.* at 7.

Rachel Cary (also known as Zeb Miles), who lived on Victoria Place, also testified that she was sitting in front of her house and witnessed "a kid trying to get into the driver's seat and at that time the cop stopped him and pulled him to behind the car, got him on the ground and beat him up." *See* Dkt. No. 182, Cary's Trial Testimony, at 8.  Cary could not recall the police officers making "an announcement specifically" for individuals to disperse, but by the time the police arrived there "were hardly any kids left, just a few stragglers." *See id.* at 6.  Cary testified that the police officers were "chasing the lingering kids that were around," and at least one police officer was shouting "Who's next, who's next," as he chased and taunted the individuals leaving Victoria Place. *See id.* at 6-7.  The only other remark Cary recalled was that, after witnessing Defendant Gunsalus "beat [Plaintiff] up," Defendant Gunsalus ran up to Cary's porch and said, "You saw him resist, right?  Right?" *See id.* at 9.  Cary responded to Defendant Gunsalus that she had seen Plaintiff resist, but that was a "kneejerk react[ion]," because she "had not actually seen him resist." *See id.* at 10.

Erin Gustke, Ms. Cary's partner at the time, woke up to loud noises on the street from the party, went out onto her porch, and saw Defendant Gunsalus walking down the street repeatedly shouting, "Who's next?" in a loud and aggressive manner. *See* Dkt. No. 178, Gustke's Trial Testimony, at 11-12.  Gustke testified that she did not hear Defendant Gunsalus identify himself as a police officer, and she did not hear him order people to disperse. *See id.* at 12.  She then explained that she watched Defendant Gunsalus approach Plaintiff in the street, and "the next thing [she] saw was that [Plaintiff] was on the ground," and Defendant Gunsalus was hitting him. *See id.* at 12-13.  Gustke testified that she saw Defendant Gunsalus's arm

swing back in the air multiple times and "come down with some force," and she saw it "more than three times." *See id.* at 13. According to Gustke, Plaintiff "was laying on the ground," and "[h]e wasn't resisting, he was just being hit." *See id.* Gustke also did not hear Plaintiff say anything. *See id.* at 14.

Kenneth McFadden, a passenger in the Cadillac, testified that he and his friends were parked legally, close to the curb, when Plaintiff came up to the vehicle. *See* Dkt. No. 180, McFadden's Trial Testimony, at 6. According to McFadden, Plaintiff was standing by the car for "[m]inutes" before "an officer walked up on [Plaintiff] and just immediately just [sic] grabbed him." *See id.* at 7. McFadden stated that he did not hear any dialogue between Plaintiff and Defendant Gunsalus. *See id.* All McFadden could see were both of Defendant Gunsalus's hands on Plaintiff and his forcing Plaintiff to the ground. *See id.* at 8, 17-19.

Patrick Johnson, the driver of the Cadillac, testified that he heard the police officers broadcast over the speaker on the police car for people to disperse. *See* Dkt. No. 183, Patrick Johnson's Trial Testimony, at 8. However, he later equivocated that he "never heard exactly what they said," and assumed that the police officers wanted partygoers to "get out of [t]here." *See id.* at 9. Patrick Johnson further testified that Plaintiff did not arrive until after the police officers announced that the people should disperse. *See id.* at 11. He then testified that, after Plaintiff began talking to him and the passengers in the vehicle, Defendant Gunsalus "simultaneously" "yelled and grabbed" Plaintiff and "swung him around." *See id.* at 13. Patrick Johnson also clarified that, when he had been speaking with Plaintiff, Plaintiff's forearms were on the rolled-down driver's window, and neither Plaintiff's person nor Johnson's car were blocking the road. *See id.* at 14.

The jury was free to credit Plaintiff's and these witnesses' testimonies to conclude that Defendants either did not order partygoers to disperse or that, for a variety of reasons, it was unreasonable for Defendants to believe that Plaintiff heard the order.  The jury also could have concluded, from this evidence, that the Cadillac was legally parked along the curb and that Plaintiff, who by all accounts was leaning into the vehicle, was not standing in the middle of the road or otherwise obstructing traffic; and, therefore, it was unreasonable for the police officers to conclude otherwise.  Additionally, none of these witnesses testified that they saw Plaintiff push, hit, or otherwise put his hands on Defendant Gunsalus; and, thus, a reasonable jury could have concluded that it was not reasonable for Defendant Gunsalus to believe he had probable cause to arrest Plaintiff for harassment in the second degree.  Accordingly, based on the foregoing evidence, it was reasonable for the jury to conclude that no reasonable officer would have believed that he had probable cause to arrest Plaintiff for disorderly conduct or harassment; and it was reasonable for the jury to find that Defendants falsely arrested Plaintiff on those charges.  Moreover, because a reasonable jury could conclude that Defendants did not have probable cause to lawfully arrest Plaintiff for disorderly conduct or harassment, the jury was required – as the Court instructed it – to find that Defendants did not have probable cause to arrest Plaintiff for resisting arrest.  For these reasons, the Court denies Defendants' motion for JMOL with respect to Plaintiff's false arrest claim.  For the same reasons, the Court finds that Defendants are not entitled to qualified immunity on this claim.

### 2.  *Whether Defendant Gunsalus is entitled to JMOL or qualified immunity on Plaintiff's excessive force claim*

"[W]here a claim for excessive force 'arises in the context of an arrest or investigatory stop of a free citizen, it is most properly characterized as one invoking the protections of the

Fourth Amendment." *Cugini v. City of New York*, 941 F.3d 604, 612 (2d Cir. 2019) (quoting [*Graham v. Connor*, 490 U.S. 386,] 394 [1989]).  "It is therefore analyzed under the Fourth Amendment's 'reasonableness' standard, rather than under the subjective 'substantive due process' approach[.]"  *Id.* (quotation omitted).  "Because 'the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it,' determining whether the amount of force an officer used is reasonable 'requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake.'"  *Id.* (quoting [*Graham*, 490 U.S.] at 396 (citations and internal quotation marks omitted)).  "According to the Supreme Court, that balancing test looks 'to the facts and circumstances of each particular case,' especially (1) 'the severity of the crime at issue'; (2) whether the arrestee poses an immediate threat to the officer or passersby; and (3) whether the arrestee is 'actively resisting arrest or attempting to evade arrest by flight.'"  *Lee v. City of Troy,* 520 F. Supp. 3d 191, 207 (N.D.N.Y. 2021) (Hurd, J.) (quoting *Graham*, 490 U.S. at 396).

With respect to Plaintiff's excessive force claim, the Court charged the jury, in relevant part, as follows:

> To determine if Defendant Gunsalus' conduct deprived Plaintiff of his right to be free from excessive force, you must determine whether the amount of force Defendant Gunsalus used when arresting Plaintiff was that which a reasonable officer would have used while making an arrest under similar circumstances.
>
> You are to determine the answer to this question based upon the totality of the circumstances surrounding the arrest at issue, in light of all of the evidence you have received in this case.  When making this determination, you may consider various factors, including (1) the severity of the crime for which plaintiff was arrested; (2) the danger or threat, if any, that Plaintiff posed to Defendant Gunsalus' or others' safety; (3) whether Plaintiff actively resisted arrest or attempted to evade arrest by flight; (4) whether Plaintiff complied

> with any direct orders from police officers; and (5) the extent and
> nature of Plaintiff's injuries …
>
> …
>
> If you find that Plaintiff has established, by a preponderance of the
> evidence, that the amount of force Defendant Gunsalus employed
> was greater than a reasonable officer would have employed under
> all of the circumstances, then Plaintiff has established that
> Defendant Gunsalus deprived him of his federal right to be free
> from excessive force.

*See* Dkt. No. 168 at 14-15.

Plaintiff was arrested for disorderly conduct, harassment in the second degree, and resisting arrest.  The parties appear to agree that, before Defendant Gunsalus attempted to physically restrain Plaintiff, he only would have been arresting Plaintiff for disorderly conduct, which is merely a violation under New York's Penal Law.  *See* N.Y. Penal L. § 240.20.  As discussed above, at trial, various witnesses testified that Plaintiff was on the side of the road, leaning into his friend's vehicle, when Defendant Gunsalus came up from behind him and began punching Plaintiff and dragging him to the ground.  In these versions of the events, Plaintiff did not pose any immediate threat to Defendants or to passersby.  As examples, there was no evidence that Plaintiff had a weapon, that he verbally threatened the officers, or that he was confronting others on the street.

The parties dispute whether Plaintiff actively resisted arrest.  During cross-examination at trial, Plaintiff was adamant that he did not push Defendant Gunsalus or "put hands on him, [he] just stepped back."  *See* Dkt. No. 179 at 67.  He further stated that he "didn't really push off [Defendant Gunsalus], [he] was trying to move [Defendant Gunsalus] off [his] shirt."  *See id.* Plaintiff explained to the jury that he pulled away from Defendant Gunsalus, who was holding

onto his shirt.  *See id.* at 68.  Ms. Cary testified, as previously described, that she also did not see Plaintiff resisting arrest.  *See* Dkt. No. 182 at 9-10.

In response to Special Interrogatory #5, the jury concluded that Defendants did not prove, by a preponderance of the evidence, that Plaintiff exerted some pressure on Defendant Gunsalus – either pushing or pulling – by placing his hands on Defendant Gunsalus's uniform sleeves or upper arms.  *See* Dkt. No. 173 at ¶ 5.  The jury was free to credit Plaintiff's and Ms. Cary's testimony; and, apparently having credited such testimony, it concluded that Plaintiff was not actively resisting his arrest in this way.  The Court finds that it was reasonable for the jury to come to that conclusion based on the evidence and testimony presented during trial. Furthermore, the Court concludes that the jury was reasonable in balancing all of the factors described in the jury instructions and finding that a reasonable officer would not have used the amount of force Defendant Gunsalus used when arresting Plaintiff for a violation.  Accordingly, the Court denies Defendants' motion for JMOL or qualified immunity on Plaintiff's excessive force claim.

### 3. *Whether Defendant Gunsalus is entitled to JMOL or qualified immunity on Plaintiff's malicious prosecution claim*

"To prevail on a malicious prosecution claim under New York law and federal law, a plaintiff must show: '(1) the commencement or continuation of a criminal proceeding by the defendant against the plaintiff, (2) the termination of the proceeding in favor of the accused, (3) the absence of probable cause for the criminal proceeding and (4) actual malice.'" *Kee v. City of New York*, 12 F.4th 150, 161-62 (2d Cir. 2021) (quoting *Smith-Hunter v. Harvey*, 95 N.Y.2d 191, 734 N.E.2d 750, 752, 712 N.Y.S.2d 438 (N.Y. 2000) (internal quotation marks omitted)) (other citation omitted).  "For a malicious prosecution claim under Section 1983, a plaintiff also

must demonstrate a 'sufficient post-arraignment liberty restraint.'" *Id.* at 162 (quoting *Rohman v. N.Y.C. Transit Auth.*, 215 F.3d 208, 215 (2d Cir. 2000)).

"To satisfy the first element, 'a defendant must do more than report a crime or give testimony.'" *Bornschein v. Herman*, 304 F. Supp. 3d 296, 302 (N.D.N.Y. 2018) (Kahn, J.) (quoting *Manganiello v. City of New York*, 612 F.3d 149, 163 (2d Cir. 2010)).  "[M]alicious prosecution claims are generally brought against arresting or prosecuting officials[.]" *Id.*  With respect to the second element, "[a] proceeding need not result in an acquittal at trial in order to be favorably terminated, although acquittal is certainly sufficient." *Daniels v. Gladstone*, No. 16-CV-190 (PKC) (JO), 2019 U.S. Dist. LEXIS 128167, *32 (E.D.N.Y. July 31, 2019) (citation omitted).[1]  "With regard to the third element of a malicious prosecution claim, 'probable cause to prosecute consists of "facts and circumstances [that] would lead a reasonably prudent person to believe the plaintiff guilty."'" *Thomas v. City of Troy*, 293 F. Supp. 3d 282, 302 (N.D.N.Y. 2018) (Suddaby, C.J.) (quoting *Ying Li*, 246 F. Supp. 3d at 611 (quoting *Boyd v. City of New York*, 336 F.3d 72, 76 [2d Cir. 2003])).  Actual malice "does not have to be actual spite or hatred, but requires only 'that the defendant must have commenced the criminal proceeding due to a wrong or improper motive, something other than a desire to see the ends of justice served.'" *Dufort v. City of New York*, 874 F.3d 338, 353 (2d Cir. 2017) (quoting *Nardelli v. Stamberg*, 44 N.Y.2d 500, 502-03. 377 N.E.2d 975, 406 N.Y.S.2d 443 (1978)).  "Malice may be inferred, however, from the absence of probable cause." *Id.* (citing *Lowth v. Town of Cheektowaga*, 82 F.3d 563, 573 (2d Cir. 1996) (citation omitted)).  Finally, as the Court held in its March 2019 order denying Defendants' motion for summary judgment with respect to this claim, "[a]

---

[1] The parties stipulated before trial that the criminal charges initiated against Plaintiff were terminated in Plaintiff's favor.  *See* Dkt. No. 131 at 2; Dkt. No. 168 at 18.

defendant released pretrial has still suffered a post-arraignment deprivation of liberty" because the defendant "'is scarcely at liberty; he remains apprehended, arrested in his movements, indeed "seized" for trial, so long as he is bound to appear in court and answer the state's charges.'"  *See* Dkt. No. 87 at 14 (quoting *Murphy v. Lynn*, 118 F.3d 938, 946 (2d Cir. 1997) (quotation omitted)).

The Court instructed the jury on each of these elements, noting specifically that if the jury found that there was probable cause for any one of the charges against Plaintiff then it must find in favor of Defendant on Plaintiff's malicious prosecution claim.  *See* Dkt. No. 168 at 16-19.  The Court further charged as follows:

> Generally, if you find that the Defendant you are considering lacked probable cause to initiate the criminal proceeding, you may, but are not required to, infer that that Defendant acted with malice. However, the ultimate question is whether the pursuit of the criminal charges against Plaintiff was undertaken in bad faith by the Defendant you are considering.

*See id.* at 19.

Additionally, the Court explained that "[a]n unconstitutional seizure occurs when there is an undue restraint placed on an individual's post-arraignment personal liberty."  *See id.*

The jury was thus left to consider the evidence presented at trial, including Brian Novitsky's testimony.  Novitsky, a sergeant in the City of Syracuse Police Department and Defendants' supervisor, indicated that he reviewed Defendant Gunsalus's arrest report and case work to check for "completeness and thoroughness and to make sure that the investigation supported the charges that were lodged against [Plaintiff]."  *See* Dkt. No. 201, Novitsky Trial Testimony, at 13-14.  Novitsky explained that police officers are allowed to make individual determinations on whom to arrest, and they also make the determination as to whether those charges go to the District Attorney's office.  *See id.* at 14.  Novitsky testified that he signed off

on the charges but that Defendant Gunsalus was the arresting officer.  *See id.*  Defendant

Gunsalus was also listed as the complainant on each of the criminal informations, which were

admitted into evidence for the jury to view.  *See* Pl's Exs. 7-9.  Based on this testimony, the jury

could reasonably have found that Defendant Gunsalus, as the arresting officer, completed and

filed the arrest report with the District Attorney's Office to satisfy the first element of Plaintiff's

malicious prosecution claim.

      Regarding the third element, as discussed above, the jury heard testimony that could

have led to the reasonable conclusion that Defendants did not have probable cause to arrest

Plaintiff for disorderly conduct or harassment.  Since the jury reasonably could have found that

Defendants did not have probable cause to arrest Plaintiff, then it follows that a reasonable jury

may have inferred malice from Defendants' lack of probable cause.  The jury also could have

reasonably credited testimony from Ms. Cary, Ms. Gustke, Plaintiff, and Plaintiff's friends that

Defendant Gunsalus appeared to be looking for a fight when calling out "Who's next?  who's

next?," swearing at Plaintiff, and seemingly attacking Plaintiff out of nowhere.

      Finally, with respect to post-arraignment deprivation, Plaintiff testified that he was taken

to the Justice Center following his arrest, but he was not incarcerated, never spent time in jail,

and was not convicted of a felony.  *See* Dkt. No. 179 at 22.  Plaintiff only spent the night in the

Justice Center and was released on his own recognizance in the morning without bail.  *See id.* at

24.  However, Plaintiff explained that he continually returned to court on a monthly basis before

the case was over, and he "felt scared" that he was "facing up to a year in jail" when "none of

that [criminal conduct] happened."  *See id.*  Defendants contend that Plaintiff did not suffer a

post-arraignment deprivation of his personal liberty because he would have had to go to court

on his disorderly conduct charges.  The Court finds this argument meritless, however, because

the jury reasonably could have concluded that Defendants did not have probable cause to arrest Plaintiff on any charges.  The Court further concludes that the jury reasonably could have credited Plaintiff's testimony and found that he suffered such a deprivation in that he had to appear in court monthly up until and through his criminal trial and was fearful about facing up to a year in jail for crimes he believed he did not commit.

In sum, based on all of the above-described testimony and evidence presented at trial, which the jury was free to credit or discredit as it wished, the Court finds that a reasonable jury could have concluded that Plaintiff established, by a preponderance of the evidence, each element to prove his claim for malicious prosecution against Defendant Gunsalus.  Accordingly, the Court denies Defendants' motion for JMOL and for qualified immunity on this claim.

### B.  Defendants' alternate motion for a new trial pursuant to Rule 59

A party may be entitled to a new trial if "the trial judge gave improper instructions to the jury" and that error is not harmless.  *Sanders v. New York City Human Resources Admin.*, 361 F.3d 749, 758 (2d Cir. 2004) (citing *Gordon v. New York City Bd. of Educ.*, 232 F.3d 111, 115-16 (2d Cir. 2000)).  "A jury instruction is erroneous, and a new trial warranted, only if it misleads a jury as to the correct legal standard or does not adequately inform the jury on the law." *Robinson v. Ballard*, No. 9:13-CV-01213 (TWD), 2019 U.S. Dist. LEXIS 165185, *16 (N.D.N.Y. Sept. 26, 2019) (Dancks, M.J.) (citing *Anderson v. Branen*, 17 F.3d 552, 556 (2d Cir. 1994)).  "As to supplemental instructions given by the district court, '[i]f a supplemental charge is legally correct, the district court enjoys broad discretion in determining how, and under what circumstances, that charge will be given.'" *Uzoukwu v. City of New York*, 805 F.3d 409, 414 (2d Cir. 2015) (quoting *United States v. Civelli*, 883 F.2d 191, 195 (2d Cir. 1989) (parenthetical omitted)).

Defendants speculate that the jury did not understand the instructions with respect to intent based on a question that a juror asked the Court in the midst of the jury charge about the meaning of intent in New York's Penal Law. *See* Dkt. No. 192-1 at ¶¶ 24-28. [2] The Court's instruction with respect to "intent" arose under Plaintiff's false arrest claim, when the Court charged the following:

> As it pertains to this case, under New York Penal Law Section 240.20, a person is guilty of disorderly conduct when, with intent to cause public inconvenience, annoyance or alarm, or recklessly creating a risk thereof, (1) he obstructs vehicular or pedestrian traffic; or (2) he congregates with other persons in a public place and refuses to comply with a lawful order of the police to disperse.

> As it pertains to this case, under New York Penal Law Section 240.26(1), a person is guilty of harassment in the second degree when, with intent to harass, annoy, or alarm another person, he or she strikes, shoves, kicks or otherwise subjects such other person to physical contact, or attempts or threatens to do the same.

*See* Dkt. No. 168 at 12-13.

The Court provided the following supplemental instruction after the juror's question to more specifically define "intent," as it is used in New York's Penal Law:

> Intent ordinarily may not be proved directly because there is no way of understanding or scrutinizing the operations of the human mind. But you may infer a person's intent from surrounding circumstances. You may consider any statement made or act done or omitted by a party whose intent is in issue, and all other facts and circumstances indicating the party's state or mind.

---

[2] Defendants additionally rely on the fact that, in a post-verdict conversation between counsel and the jury, the jurors allegedly said that they were "hung up" on the issue of Plaintiff's intent. Not only do Defendants improperly rely upon post-trial, off-the-record discussions, but Defendants do not provide any specifics as to which juror made this statement, if all jurors agreed, if it was a misstatement, or if it warrants any sort of post-trial inquiry. In addition, although Defendants contend that the juror's statements show that the jury improperly considered Plaintiff's intent, the statements could also be interpreted as indicating that the jurors were truly "hung up" on the issue of whether Defendants had probable cause to believe that Plaintiff had the intent to violate New York's Penal Law, which is what the jury was required to consider. The Court therefore rejects Defendants' reliance on these alleged statements.

> You may consider it reasonable to draw the inference and find a person intends the natural and probable consequences of acts knowingly done or knowingly omitted.  It is for you to decide what facts have been established by the evidence.

*See* Dkt. No. 169.

Defendants do not point to any admissible evidence that the jurors completely disregarded the Court's instructions that "reasonable cause," with respect to Plaintiff's false arrest claim, "means that Defendants had information at the time they arrested Plaintiff that would cause a reasonable officer, under the same facts and circumstances as Defendants, to believe that Plaintiff committed or was about to commit a crime."  *See* Dkt. No. 168 at 11.  A reasonable officer, to determine if Plaintiff was about to commit or had committed a crime that requires intent, would need to know if Plaintiff had that intent.  The jury reasonably could have parsed this information to conclude that Defendants did not have probable cause to arrest Plaintiff because there was no evidence that Plaintiff intended to violate the Penal Law through his alleged disorderly conduct or harassment.  Defendants have "not shown the jury instructions were legally incorrect, led to any jury confusion, or caused any prejudice."  *Robinson*, 2019 U.S. Dist. LEXIS 165185, at *16 (citing *Nimely v. City of New York*, 414 F.3d 381, 392 (2d Cir. 2005) (citations omitted)).  Therefore, because Defendants have "failed to show the instructions resulted in a seriously erroneous result or a miscarriage of justice," *id.*, the Court denies their alternate motion.

### C.  Plaintiff's motion for a new trial on punitive damages

Plaintiff contends that the Court erred in the following two ways: (1) in rejecting his request to give a jury instruction as to punitive damages; and (2) by precluding evidence that Defendant Gunsalus placed a hard object against Plaintiff's throat.  *See* Dkt. No. 187-1, Pl's

Memorandum in Support of Motion for New Trial, at 1.  Plaintiff argues that a punitive damages instruction would have been appropriate on both his excessive force and malicious prosecution claims.  *See id.* at 1-3.  According to Plaintiff, the testimony at trial revealed that Defendant Gunsalus punched Plaintiff "for no reason, and then the 250 pound man sat on the much smaller [Plaintiff]'s back as he punched him multiple times[.]"  *See id.* at 3.  Plaintiff contends that this evidence is "more than enough" to find the requisite evil motive or intent or the degree of reckless or callous indifference to his rights such that the Court was required to instruct the jury on punitive damages.  *See id.* (citing *DiSorbo* [*v. Hoy*, 343 F.3d 172], 175 [2d Cir. 2003]).  Plaintiff argues that, as evidenced by its second note, "the jury was clearly looking to find a way to award greater damages[.]"  *See id.* (citing Dkt. No. 171).  Plaintiff asserts that his physical injuries – including his ripped earlobe and swollen face – "were real but not overwhelming," and "[a] punitive damage instruction would have allowed for a proper verdict commensurate with the nature of Defendant Gunsalus' behavior and the evil intent it represented."  *See id.* at 3-4.  Furthermore, Plaintiff argues that, if the Court grants a new trial on the issue of punitive damages, then the Court should permit Plaintiff to admit evidence that Defendant Gunsalus pressed a hard object against his throat.  *See id.* at 4-5.

"A party is not entitled to have the court give the jury an instruction for which there is no factual predicate in the trial record."  *McCardle v. Haddad*, 131 F.3d 43, 52 (2d Cir. 1997) (citations omitted).  "A punitive damages instruction is appropriate when the plaintiffs have produced evidence that 'the defendant's conduct is . . . motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others'; or, in other words, when the plaintiffs have produced evidence of 'a positive element of conscious wrongdoing' or 'malice.'"  *Cameron v. City of New York*, 598 F.3d 50, 69 (2d Cir. 2010)

(quoting *New Windsor Volunteer Ambulance Corps., Inc. v. Meyers*, 442 F.3d 101, 121-22 (2d Cir. 2006) (internal quotation marks omitted)).  "Consequently, a plaintiff is not entitled to an instruction allowing the jury to award punitive damages unless there is evidence that the defendant's conduct could be so characterized."  *McCardle*, 131 F.3d at 53.

Plaintiff does not appear to argue that he was entitled to a punitive damages instruction on his false arrest claim but contends that a punitive damages instruction was appropriate for his excessive force and malicious prosecution claims.  As the jury only found Defendant Gunsalus liable with respect to those claims, Plaintiff apparently seeks a new trial before a new jury panel to determine whether Defendant Gunsalus must pay Plaintiff punitive damages.  Notably, this is a unique procedural request, and the Court has not found any other cases in which a court held a separate trial on punitive damages after excusing the original jury and in which the plaintiff was permitted to reintroduce the original evidence.  Nonetheless, even if the Court could order that particular relief, the Court declines to do so.   Although the jury was entitled to conclude that Defendant Gunsalus's conduct violated Plaintiff's constitutional rights, Plaintiff did not present sufficient evidence to show that Defendant Gunsalus acted with an "evil motive or intent."  As the Court concluded in denying Plaintiff's request for a punitive damages instruction at the charge conference, "given the facts and circumstances of the case," it was not "an appropriate charge and if the jury somehow found it to be necessary, [the Court would] have to set it aside as against the weight of the evidence[.]"  *See* Dkt. No. 205, Charge Conference Transcript, at 4.  Accordingly, the Court denies Plaintiff's motion for a new trial on punitive damages.

### III. CONCLUSION

After carefully considering the entire file in this matter, the parties' submissions, and the applicable law, and for the above-stated reasons, the Court hereby

**ORDERS** that Defendants' motion for judgment as a matter of law, qualified immunity, or a new trial, *see* Dkt. No. 192, is **DENIED**; and the Court further

**ORDERS** that Plaintiff's motion for a new trial on punitive damages, *see* Dkt. No. 187, is **DENIED**.

**IT IS SO ORDERED.**

Dated:  January 10, 2022
       Syracuse, New York

Frederick J. Scullin, Jr.
Senior United States District Judge